J-A13013-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: M.M.B., A MINOR, D/O/B: 5/29/2002 | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: C.R., NATURAL FATHER | : | No. 1760 WDA 2014 |

Appeal from the Decree entered July 16, 2014
in the Court of Common Pleas of Crawford County
Orphans' Court, at No(s): O.C.D. No. 2014-13

| | | |
|---|---|---|
| IN RE: K.B.R., A MINOR, D/O/B: 2/23/2010 | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: C.R., NATURAL FATHER | : | No. 1761 WDA 2014 |

Appeal from the Decree entered July 16, 2014
in the Court of Common Pleas of Crawford County
Orphans' Court, at No(s): O.C.D. No. 2014-14

| | | |
|---|---|---|
| IN RE: S.M.R., A MINOR, D/O/B: 11/16/2012 | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: C.R., NATURAL FATHER | : | No. 1762 WDA 2014 |

Appeal from the Decree entered July 16, 2014
in the Court of Common Pleas of Crawford County
Orphans' Court, at No(s): O.C.D. No. 2014-15

BEFORE:  PANELLA, J., SHOGAN, J., and OTT, J.

MEMORANDUM BY PANELLA, J.                    **FILED JUNE 09, 2015**

C.R. ("Father") appeals from the final decree entered on July 16, 2014, in the Court of Common Pleas of Crawford County, involuntarily terminating his parental rights to his female child, M.M.B, born in May 2002, to his male

child, K.B.R., born in February 2010, and to his female child, S.M.R., born in November 2012, ("Children"), pursuant to 23 Pa.C.S.A. § 2511(a)(1), (5), (8), and (b).[1]  We affirm.

We summarize the relevant factual and procedural history as follows. At the time of the termination hearing, Mother, born in April 1988, was incarcerated in the Crawford County Correctional Facility in Saegertown, Pennsylvania.  Father, born in September 1983, was also incarcerated in the Crawford County Correctional Facility.  Father has multiple prior convictions, including convictions for corruption of minors, burglary, indecent assault, theft by deception, and theft by unlawful taking.  **See** Memorandum and Order, 7/16/14, at 2.

Father and Mother met in 2001 and were sexually involved when father was 17, and Mother was 13.  Father's corruption of minors charges and indecent assault charges stem from their relationship.  Father and Mother were not married at the time of the birth of all three of the Children. **See id**.

In 2008, Judge Vardaro entered an order that restricted Father's access to his daughter, M.M.B., until he completed Community Abuse Response Team ("CART") counseling.  In 2011, the trial court allowed Father to have supervised visitation of M.M.B., but nothing more until a custody evaluation was completed.  **See id**.

---

[1] On March 7, 2014, H.M.L., ("Mother"), voluntarily terminated her parental rights to the Children.

At the time of S.M.R.'s birth in November 2012, she tested positive for marijuana and methadone and was discharged in December, having been prescribed medication to control her withdrawal symptoms. In November 2012, CYS received a General Protective Services Report relative to the allegations of parental substance abuse, which was generated due to S.M.R. displaying symptoms of withdrawal at birth.

On the same date as S.M.R.'s discharge, Leo Horne from CYS conducted a home visit to complete a Safety Plan with Mother. The Safety Plan prohibited Father from being in the presence of the Children until cleared by CYS. While Mr. Horne was at the residence addressing the Safety Plan, Father arrived with Mother's mother. When Father was advised that he was not to have contact with the Children, he lost emotional control and began screaming profanities and making threats. Father then contacted the State Police and demanded that CYS leave the premises. When the State Police arrived, Father continued his disruptive behavior and was taken into custody.

On December 30, 2012, S.M.R.'s lung collapsed, and she was hospitalized in the Pediatric Intensive Care Unit of Children's Hospital in Pittsburgh, Pennsylvania. *See id*. at 2-3. On January 1, 2013, CYS learned that S.M.R. had been admitted to Children's Hospital due to her collapsed lung. It was reported that Father had been visiting S.M.R. since her admission to the hospital, which was a violation of the Safety Plan. *See id*. at 3.

On January 2, 2013, an Emergency Order was entered by the trial court directing that K.B.R. and S.M.R., after being released from the hospital, be placed in kinship care with their maternal aunt, P.B., and that M.M.B. be placed in kinship care with her maternal aunt, T.W. The Children were removed from the home of their parents on January 3, 2013, and have been in foster care for a total of seventeen months. M.M.B. is socially and emotionally well-adjusted and regularly visits her siblings. Ms. W. wants to adopt her. Following a shelter hearing, Father was permitted supervised visits with M.M.B. and K.B.R. at CYS. However, any visitation between Father and M.M.B. would only take place if M.M.B. so desired. Father was also permitted to visit S.M.R. at Children's Hospital if monitored by hospital staff. *See id*.

K.B.R. resided with P.B. from January 21, 2013 until January 6, 2014. S.M.R. was placed with P.B. upon her discharge from the hospital on January 20, 2013, and resided there until January 6, 2014. During the time, maternal aunt, J.H., had contact with K.B.R. and S.M.R. and cared for both children while P.B. worked. *See id*. at 4.

On March 20, 2013, an adjudication hearing was held, where it was recommended that all three Children be adjudicated dependent due to their parents' drug and alcohol dependency, Father's failure to complete the court-ordered CART program, and Father's mental health diagnosis. Pursuant to the Master's Recommendation, both Father and Mother were ordered to follow the recommendations of the mental health assessments,

as well as the recommendations of the drug and alcohol assessments. Father was directed to follow the recommendations of the CART Risk Assessment program, while Mother was ordered to participate in the non-offending CART program. Both Father and Mother were ordered to participate in family preservation until successfully discharged, and were ordered to participate in all requested random drug screens. Father and Mother were also allotted weekly supervised visits at the home of the Children's kinship providers. *See id*.

At the permanency review hearing held on July 29, 2013, the Master found that Father had only minimally complied with the permanency plan in that he had completed a CART assessment, drug and alcohol assessment, but had not followed through with any of the recommendations made, and had not participated in any home-counseling services. The Master also found that M.M.B. was unable to start weekly out-patient therapy at Parkside Psychological on May 24, 2013, because her parents did not sign the initial paperwork. In addition, both parents were allowed to visit K.B.R. as often as they wished at his kinship home, and both parents visited K.B.R. six times. The kinship caregiver reported that both parents acted appropriately during their visits. *See id*.

Also, at the July 29, 2013 hearing, the Master found that Father had minimal contact with the CYS caseworker since the adjudication hearing, and had not met with the caseworker since March 25, 2013. On February 25, 2013, a referral was made with regard to in-home counseling for Father, but

Father was discharged on May 2, 2013 due to non-compliance. A referral was made for Father for CART counseling on May 1, 2013; however, Father did not attend the Cart counseling sessions. Father completed a drug and alcohol assessment on January 31, 2013, but did not attend any out-patient counseling sessions. Father also completed a mental health assessment on January 18, 2013, but did not follow through with the recommendations of out-patient counseling. At the time of the review hearing, Father was incarcerated, and had additional charges pending against him relative to theft-related matters. At the end of the hearing, Father was ordered to follow the recommendations of the Mental Health Assessment and CART Risk Assessment, as well as participate in Family Preservation until successfully discharged. Father was also permitted to have supervised visitation of the Children in the home of the kinship providers weekly when discharged from incarceration. ***See id***. 4-5.

Another permanency review hearing was held on November 18, 2013. It was found that Father had only minimally complied with the permanency plan in that he had not participated in the in-home counseling service and had not participated in the out-patient drug and alcohol therapy as recommended. He had also not completed a CART assessment in February 2013, and he had not started any recommended treatment partly due to his incarceration. ***See id***. at 5. Father also indicated that, in March 2014, he would go to a State Correctional Institution to serve a 2-4 year sentence. In

addition, while in the Crawford County Correctional Facility, he participated in parenting classes, in drug and alcohol counseling, and obtained his GED.

At the end of the November 18, 2013 hearing, the Master recommended that Father follow the recommendations of his mental health assessment and of the Cart Risk Assessment, and recommended that both parents be awarded visitation of the Children at least two times per week while not incarcerated. *See id*.

M.H. and J.H. were approved as a placement resource for K.B.R. and S.M.R., and, on January 6, 2014, the Children were placed in their home. The Children are socially and emotionally well-adjusted in the home of their kinship parents, who desire to adopt them. *See id*.

At the February 19, 2014 Permanency Review Hearing, the Master found that there had been minimal compliance on Father's part with the permanency plan in that, while he completed a drug and alcohol assessment and was recommended to participate in out-patient therapy, he had not shown up for three appointments. Father had not been drug screened since December 16, 2013, and he had often not shown up or cancelled visitations since the last permanency review hearing, and failed to participate in sexual offender specific treatment as recommended. Father had been consistently following the recommendations of his out-patient counselor, but had not complied with the recommendations from the CART assessments he completed in February of 2013, and had not followed the recommendation of the drug and alcohol assessment for out-patient counseling. *See id*. at 5-6.

At the time of the February 19, 2014 permanency review hearing, Father was not present; his whereabouts were unknown. Prior to his disappearance, Father was visiting with the Children, although his visits were inconsistent. Father was also directed to follow the recommendations of the CART Risk Assessment and the drug and alcohol assessment. Importantly, the Master found that visits between M.M.S. and her parents at the kinship provider's home did not go well. Her parents would yell and use derogatory language toward her. *See id*. at 6.

On March 7, 2014, Mother executed three separate consents to the adoption of the Children, but failed for a period of at least 30 days to execute a petition voluntarily terminating her parental rights to the Children. Mother has been incarcerated from June 2013 to July 2013, from September 2013 to November 2013, and from February 2014 to the present.

On April 11, 2014, CYS filed a Petition for Involuntarily Termination of Father's Parental Rights. Father had been incarcerated from June 2013 to November 2013, and from February 2014 to the present.

An evidentiary hearing was held on both Father's Petition for Involuntary Termination of Parental Rights and Mother's Petition to Confirm the Consent to Adopt the three Children on May 28, 2014. Both Father and Mother were present at the hearing, as well as counsel for both parties, counsel for CYS and the Children's Guardian *ad litem*. At the hearing, the trial court heard testimony from maternal aunt, J.H., who currently has

custody of K.B.R. and S.M.R., CYS case manager, Elizabeth Lunger, Father, and Mother.  ***See id***.

J.H. testified that visitation between the siblings occurs at least weekly, often occurring three to four times a week, and that communication between her and T.W. is frequent and open to allow for such visits.  J.H. indicated that, at the start of December 2013, both Father and Mother stopped visiting with K.B.R. and S.M.R.  J.H. also complained that both Father and Mother often fell asleep during visitations, and that they were late for visitations from January 16, 2014 to January 28, 2014.  Visitations were suspended between Father and Mother and the Children in February 2014 dues to noncompliance.  ***See id***.

J.H. testified that, on the evening of February 5, 2014, Father showed up at her home and told her that Mother had been arrested.  J.H. noted that Father requested to say goodbye to K.B.R. because Father was leaving for North Carolina.  J.H. noted that K.B.R. was visibly upset both during and after the visit, and that he was up all night crying for Father.  J.H. stated that Father has not visited K.B.R. since that time, and has called only one time since his visit.  ***See id***. at 7.

Ms. Lunger, the CYS caseworker, stipulated that the parents were entitled to visits while incarcerated.  K.B.R. visited Father and Mother several times while in jail.  S.M.B. was not permitted to visit by her doctors and due to her age, and M.M.B. chose not to visit Father, feeling uncomfortable vising him while he was incarcerated.  ***See id***.

Ms. Lunger further testified that Father was released to an uncle's home after being incarcerated in November 2013. Father met Ms. Lunger at her office one time because he did not have a permanent home. Ms. Lunger stated that she did not maintain contact with Father while he was incarcerated since she was not provided with his contact information. She noted that she attempted to meet with Father numerous times after he was released, went to his home, and called him at the phone number provided three or four times per month, all to no avail. Father also failed to respond to any correspondence sent to him by Ms. Lunger. *See id*.

Father noted that, while he may have been travelling to North Carolina to visit his sick mother, he was also going to North Carolina because there was a warrant out for his arrest, and he was trying to avoid going to jail. Father admitted that he made no accommodations or preparation for the Children before he left, or during the time he was in North Carolina. Father noted that he intended to come back, and acknowledged that the kinship providers of the Children were unaware of his location, and would have been unable to reach him if there had been an emergency. *See id*.

On March 17, 2014, Father was located in North Carolina and was arrested. He had an outstanding warrant in North Carolina for a larceny charge in 2012, as well as an outstanding Pennsylvania warrant. Father went back to Pennsylvania in Mid-April, and has been incarcerated in the Crawford County Correctional Facility, as well as the Erie County Correctional Facility, since that time. *See id*.

At the hearing, Father reassured the court that he is close to K.B.R., but conceded that he left his relationship with M.M.B. up to her, and has had no contact with M.M.B. Despite visiting S.M.R., Father also has no relationship with her due to her young age. Father also testified that he maintained visits with the Children from January 2013 to March 2013. He brought the Children gifts, and paid child support until he was arrested again in March 2013 for driving with a suspended license. *See id*.

Father testified that he went to drug and alcohol sessions at least twelve times from November 2013 until February 2014, but that he did not attend CART counseling partly due to his incarceration. *See id*. at 7-8. Father acknowledged that he has a drug addiction problem, and that he steals in order to obtain the money needed to purchase drugs. When questioned as to why he did not attempt to overcome his addiction through drug and alcohol services, Father had no answer, but acknowledged that he should have done so. Father also testified that he had no intention of going through CART counseling, even if completion is a prerequisite for the Children returning to his care. *See id*. at 8.

Father requested a post-adoption contract agreement, but J.H. refused. The record showed that reasonable efforts were made by CYS to reunify the Children with their parents. CYS offered numerous services and frequent visitation between the Children and Father and Mother. *See id*.

The Guardian *ad litem*, Attorney Debra Higgins, opined that she believes that it is in the Children's best interest for the parental rights of

Father to be terminated, and for the Children to be adopted by their kinship care providers. *See id*.

Father is currently incarcerated in the Crawford County Correctional Facility for an aggregated sentence of twenty-four to eighty-four months. Father has three additional criminal cases pending against him in which he has not has not been sentenced. *See id*.

Following the hearing, the trial court issued a final decree entered on July 16, 2014, involuntarily terminating Father's parental rights of the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2). (5), and (b). Father filed a timely notice of appeal. At the trial court's request, Father filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b) on December 22, 2014.[2] This Court consolidated *sua sponte* the appeals at 1760 WDA 2014, 1761 WDA 2014, and 1762 WDA 2014.

Initially, we review the termination decree according to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our

---

[2] Although initially Father failed to comply with Pa.R.A.P. 1925(a)(2)(i), relating to the Children's fast track appeals, we decline to dismiss or quash his appeal. *See In Re K.T.E.L.*, 983 A.2d 745, 747 (Pa. Super 2009) (holding that the failure to file a concise statement of errors complained of on appeal with the notice of appeal will result in a defective notice of appeal, to be disposed of on case by case basis). Since the misstep was not prejudicial to any of the parties and did not impede the orphans' court's ability to issue a thorough opinion, the procedural error was harmless.

standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As we discussed …, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-827 (Pa. 2012) (internal citations

omitted).

Termination of parental rights is governed by Section 2511 of the

Adoption Act, which requires a bifurcated analysis.

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the

standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S.A. § 2511). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *See In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Instantly, the decree terminated Father's parental rights pursuant to § 2511(a)(1), (5), (8), and (b). This Court must agree with only one subsection of 23 Pa.C.S.A. § 2511(a), in addition to § 2511(b), in order to affirm the termination of parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Herein, we review the decree pursuant to § 2511(a)(1) and (b), which provide as follows.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

>> (1) The parents by conduct continuing for a period of at least six months immediately preceeding the filing of this petition either have evidenced a settled purpose of relinquishing parental claim to said children or have refused or failed to perform parental duties.

>> …

> **(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on

- 14 -

the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

We have explained this Court's review of a challenge to the sufficiency of the evidence supporting the involuntary termination of a parent's rights pursuant to section 2511(a)(1) as follows.

> To satisfy the requirements of section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child *or* a refusal or failure to perform parental duties.
>
> …
>
> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (citations omitted).

> [T]o be legally significant, the [post-abandonment] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his

- 15 -

parental responsibilities bears the burden of proof on this question.

*In re Z.P.*, 994 A.2d 1108, 1119 (Pa. Super. 2010) (emphasis added) (citation omitted). *See also In re Adoption of C.L.G.*, 956 A.2d 999, 1006 (Pa. Super 2008) (*en banc*).

In *In re Adoption of Charles E.D.M.*, 550 Pa. 595, 602, 708 A.2d 88, 91 (1998), our Supreme Court stated that Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child *and* refusal or failure to perform parental duties, as *or* joins the two portions of the statute.

Further, regarding the definition of "parental duties," this Court has stated as follows.

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all

available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . her physical and emotional needs.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citations omitted).

In this case, Father's history is well-documented in the record. Father's parenting skills and concern as a parent are minimal, as he has not managed to finish his reunification plan over a period of 6 months or more. During intermittent periods when Father was not incarcerated, it is clear from the testimony that Father was overtaken by his drug and alcohol addiction. Father was not compliant with the Safety Plan put in place by CYS, which mandated that he was not to be in the presence of the Children until cleared by CYS. Although Father has made some progress with his mental health and his drug and alcohol usage problems, none of the items in Father's plan has been completed. The trial court found that, until Father completes the plan, success cannot be declared, and that the importance of the service plan and the goal it identifies for the Children cannot be overemphasized. *See In re J.S.W.*, 651 A.2d 167 (Pa. Super. 1994).

Additionally, Father has not had unsupervised contact with any of his Children since January 2012. The kinship care providers have taken on the parental role for the Children, and Father, when he does visit, acts not as a parent, but as an acquaintance of the Children. The kinship care providers

performed not just the day-to day parental functions, but also performed the parental role during Father's visits. The only major impediment to Father getting, at the very least, unsupervised visits with the Children was for Father to attend CART counseling. However, under oath, Father admitted that he was not interested in attending or completing CART counseling. **See** Memorandum and Order, 7/15/14, at 11.

In addition, incarceration of a parent does not provide sufficient grounds for termination of parental rights. An incarcerated parent's responsibilities are not tolled during his incarceration. A parent's absence and failure to support his children due to incarceration is not conclusive evidence of whether the parent has abandoned the children. However, it is incumbent upon a parent when separated from his children to maintain communication and association with the children. **See In re Adoption of S.P.**, 47 A.3d at 826-27.

In this case, Father has been in and out of jail a number of times since the Children have been placed in foster homes. Father left it up to M.M.B. to decide whether or not she wished to visit him in jail. M.M.B. decided that she was uncomfortable visiting him in jail and never once visited him while he was in jail. S.M.R. also did not visit Father in jail due to her age and medical conditions. However, there was no demonstration on Father's part that he attempted to maintain a place of importance in S.M.R.'s life when he was not in jail. K.B.R. was the only child that visited Father while he was

incarcerated. The trial court recognized that Father and K.B.R. had, at least, some sort of relationship, but it was unclear whether Father maintained communication with K.B.R. during the visits in prison; what the visits were like at the jail; and, whether the visits were positive for K.B.R. *See* Memorandum and Opinion, 7/15/14, at 12.

The trial court found that Father's continuing actions or inactions were harmful to K.B.R. and all of his Children and that K.B.R. has been harmed by the bond that he has with Father since Father undermines the progress that K.B.R. has made in the home of his kinship provider. The trial court determined that Father put his interests above the Children's interests, and failed to analyze the effects his actions have on the Children's lives because he is unwilling to do what it takes to get his Children back.

At the time of the hearing, Father was facing a sentence of, at least 24 months in prison—and he was awaiting the disposition of various other charges. The trial court found that the length of Father's remaining confinement is relevant to the trial court's determination that Father will be spending a significant amount of time incarcerated, and will miss many milestones in the lives of all three Children. *See In re Adoption of S.P.*, 47 A.3d at 827-28.

After a careful review of the record, we find no merit to Father's argument concerning Section 2511(a)(1).

Next, in reviewing the evidence in support of termination under Section 2511(b), our Supreme Court recently stated as follows.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*See also In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

Father also challenges the sufficiency of the evidence to support the termination of his parental rights under Section 2511(b). In reviewing the case, the trial court found that Father cannot care for the Children's needs because he still has serious drug and alcohol, mental health, housing, and employment problems which have not been resolved, and Father will be imprisoned for a number of years. Memorandum and Opinion, 7/15/14, at 13.

In addition, with regard to Section 2511(b), the evidence reveals that Father does not have a strong bond with the Children. On the other hand, the evidence reveals that the Children have a strong emotional bond with their foster parents, who take care of all of their needs. The trial court

- 20 -

found that there is no evidence that the Children would be adversely affected if their relationship with Father is severed.

The competent evidence in the record shows Father failed to "exhibit [the] bilateral relationship which emanates from the parent['s] willingness to learn appropriate parenting . . . ." *In re K.K.R.S.*, 958 A.2d 529, 534 (Pa. Super. 2008). He did not put himself in a position to assume daily parenting responsibilities so that he could develop a real bond with the Children. *See In re J.L.C.*, 837 A.2d 1247, 1249 (Pa. Super. 2003).

Although Father may love the Children and desire an opportunity to serve as their father, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010); N.T., 7/12/13, at 59. We stated in *In re Z.P.*, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id*. at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d at 856.

Accordingly, we affirm the final decree terminating Father's parental rights to the Children.

Final Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>6/9/2015</u>